UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**SUE WAGNER**,                                  Case No. 4:11 CV 1891

          Plaintiff,                              Magistrate Judge James R. Knepp, II

     v.                                            MEMORANDUM OPINION AND ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

          Defendant.

### INTRODUCTION

Plaintiff Sue Wagner appeals the administrative denial of Supplemental Security Income (SSI)[1] under 42 U.S.C. § 1383(c). The district court has jurisdiction over this case under 42 U.S.C. § 1383(c)(3). The parties consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 13). For the reasons given below, the Court affirms the Commissioner's denial.

### BACKGROUND

Plaintiff filed an application for SSI on December 28, 2007 and again on October 30, 2008, both times alleging a disability onset date of December 1, 2007. (Tr. 141, 146). Her applications were denied initially (Tr. 72) and upon reconsideration (Tr. 81). Plaintiff then requested a hearing before an Administrative Law Judge (ALJ). (Tr. 84). Born in 1958, Plaintiff was 51 years old at the time of the ALJ's hearing. (Tr. 35).

Medical History

Plaintiff's main medical problems stem from degenerative bone disease in her neck, scoliosis

---

1. Plaintiff initially filed applications for both SSI and Disability Insurance Benefits (DIB), but was denied eligibility for DIB on the basis of not having worked long enough (Tr. 68), and does not appeal this denial.

of the spine, panic attacks, headaches, asthma, neuropathy, and numbness in her arms. (Tr. 163, 238). Plaintiff has reported severe pain in her neck and shooting up her arms. (Tr. 201).

Plaintiff underwent an MRI of her cervical spine in September 2001. (Tr. 252). The radiologist interpreting this scan found moderate degenerative disc changes involving the C4-C5 and C5-C6 levels with associated uncal vertebral spurring. (Tr. 252). The MRI reportedly revealed moderate spinal canal stenosis at these levels and slight impingement of the ventral aspect of the spinal cord, worse at the C4-C5 level. (Tr. 252). The remainder of Plaintiff's cervical spine was unremarkable. (Tr. 252).

In April 2006, Plaintiff's primary care physician, Douglas Harley, D.O., noted texture changes and muscle spasm in Plaintiff's lower cervical spine with mild decreased motion secondary to pain. (Tr. 278). Dr. Harley reported Plaintiff was sleeping better, though, and had decreased pain as a result of medication. (Tr. 279).

In June 2006 (still before the alleged onset date), Plaintiff complained of numbness in her left hand. (Tr. 276). Her physician thought this may have been exacerbated by lifting at work. (Tr. 276). On examination, Dr. Harley found the range of motion in Plaintiff's arms was decreased by five degrees in every direction. (Tr. 277). But at subsequent doctor's visits throughout the remainder of 2006 and 2007, Plaintiff reportedly had normal pulses and no pedal edema in her extremities. (Tr. 263, 265, 267, 269, 273, 275). In fact, in January 2007, Plaintiff's extremities were also noted to be non-tender with a full range of motion. (Tr. 271).

Plaintiff was interviewed face-to-face by SSA employees multiple times. In December 2007, the SSA employee interviewing Plaintiff observed she had difficulty writing and using her hands. (Tr. 160). Plaintiff reportedly "demonstrated limitations of motion, particularly with [her] right arm

2

and hand". (Tr. 160). In October 2008, Plaintiff still reportedly had difficulty writing and using her hands, and the SSA employee noted Plaintiffs "hands were swollen." (Tr. 198). In April 2009, Plaintiff's "right hand [wa]s swollen and she sa[id] it[ is] very painful" with the pain reportedly traveling to her neck. (Tr. 230).

Since before the alleged onset date, Plaintiff has routinely seen providers at the Youngstown Community Health Center for management of her asthma. (Tr. 258–281, 376–388, 396–441). Plaintiff has consistently complained to these providers of neck pain, and for several years was consistently prescribed Vicodin and Soma to help control it. (Tr. 269–274, 280, 385). In June 2008, Dr. Harley characterized Plaintiff's neck pain as moderate and dull. (Tr. 383). At that time, he also recommended moist heat and exercise. (Tr. 384). In September 2008, Plaintiff returned to Dr. Harley for a follow up, again complaining of chronic neck pain, and Dr. Harley noted non-tender extremities with a full range of motion, no pedal edema, and normal pulses. (Tr. 380–381).

In November 2008, Plaintiff underwent x-rays of her cervical spine. (Tr. 334). The radiologist interpreting these x-rays reported they showed mild disc space narrowing at C4-C5 with mild proliferative spur formation about the anterior vertebral body margins. (Tr. 334). No other abnormalities were noted. (Tr. 334). Records from the Office of Disability Determination indicate Plaintiff had to quit a job in November 2008 because "her hands kept swelling up from using the mouse". (Tr. 218). At that time, Plaintiff informed SSA her condition had changed, saying she completely loses mobility in her left arm. (Tr. 223). Plaintiff also reported she can vacuum "with her good hand" and can do laundry, but noted her hands are very sensitive to temperature extremes. (Tr. 219).

For a significant amount of time, Plaintiff continued making monthly visits to the Health

3

Center for pain medication refills. (Tr. 376–388, 397–418, 425–441). These monthly visits were mandatory because of the controlled substances she was prescribed for pain. (Tr. 401, 406). Over the course of these followup appointments, Plaintiff frequently reported that the medication she was prescribed helped her pain. (Tr. 376, 385, 397). For instance, at a May 2010 follow up, Plaintiff reported her medication takes her pain from a nine down to a one or two. (Tr. 397). At one point, Plaintiff was given a refill for Vicodin but not her other pain medication, and she was reportedly "[v]ery upset". (Tr. 405–406). In September 2009, Plaintiff's doctors at the Health Center believed Plaintiff's chronic neck pain was controlled by her medication. (Tr. 414).

Physicians at the Health Center frequently reported normal findings about Plaintiff's extremities. (Tr. 379, 381, 384, 388, 416, 418). However, they occasionally reported 4/5 grip strength (Tr. 377, 418), cervical spasms (Tr. 377), and reported numbness in Plaintiff's arms (Tr. 376, 383, 413). In addition, the providers at the Youngstown Community Health Center prescribed Plaintiff an antidepressant for depression. (Tr. 400, 415). In September 2010, personnel at the Health Center advised Plaintiff that the doctors there would no longer be prescribing chronic controlled pain medication. (Tr. 425). The transcript contains no records after this appointment.

Since applying for benefits, Plaintiff has been evaluated by several consultants. In March 2008, Plaintiff had extensive muscle testing conducted by consultant physician Prabhudas Lakhani, M.D. (Tr. 286–289). This revealed "good" motor strength in Plaintiff's shoulders, elbows, and wrists, and "fair" motor strength in her fingers. (Tr. 286). Plaintiff showed normal grasp, manipulation, pinch, and fine coordination on the left side. (Tr. 286). On the right side, Plaintiff had normal manipulation, pinch, and fine coordination, but diminished grasp due to pain. (Tr. 286). No spasm, spasticity, clonus, primitive reflexes, or muscle atrophy were present. (Tr. 287). Plaintiff's

extremity joints displayed a limited range of motion in flexion, extension, lateral flexion, and right

rotation, but not in left rotation. (Tr. 287). Plaintiff's right shoulder showed significantly limited

active range of motion, but Plaintiff's left shoulder showed normal active range of motion. (Tr. 287).

Both of Plaintiff's elbows and both of Plaintiff's wrists showed normal active range of motion.

(Tr. 288). Similarly, all of Plaintiff's fingers showed normal flexion and extension. (Tr. 288).

Plaintiff's dorsolumbar spine, hips, knees, and ankles also revealed normal ranges of motion.

(Tr. 288–289).

On examination, Dr. Lakhani also noted Plaintiff's hands swell. (Tr. 291). He explained:

> She has right-sided paracervical pain and right shoulder pains which radiate down
> to the right hand. This makes the right hand numb which becomes sensitive to hot
> and cold. That creates weakness in the right upper extremity secondary to pain. She
> cannot lift the right arm up beyond 90 degrees. She claims that she has scoliosis.
> Occasionally she has back pain. The pain does not have radiation. She uses an
> orthotic which helps the back pain considerably.

(Tr. 291). Dr. Lakhani deemed Plaintiff's gait and ambulation normal. (Tr. 291). He found no

peripheral edema, clubbing, cyanosis, or jaundice in Plaintiff's extremities. (Tr. 292). Dr. Lakhani

noted weak grip strength in Plaintiff's right hand and "considerably restricted" movements in

Plaintiff's right shoulder with tenderness in the anterior superior aspect of the right shoulder.

(Tr. 292). He reported a negative straight leg raising test. (Tr. 292).

Dr. Lakhani had three x-rays taken and reported they showed well-maintained intervertebral

spaces with no sclerosis or spur formations. (Tr. 292). He also noted mild degenerative changes with

a tiny spur formation on the anterior superior aspect of L5, but said the study was otherwise

unremarkable. (Tr. 292). Dr. Lakhani reported a diagnostic impression of right shoulder capsulitis,

right paracervical sprain with radiculopathy, morbid obesity, and insignificant low back pain.

(Tr. 292). He concluded Plaintiff "could carry ten pounds for short distances", could walk and sit

5

at liberty, could open a jar with her left hand, and could pick up a coin without sliding it. (Tr. 292). He also said Plaintiff's memory, concentration, and understanding are good. (Tr. 292).

The same month, Plaintiff underwent nerve conduction studies. (Tr. 295–298). These demonstrated "borderline prolongation of [the] left median distal motor latency" and borderline slowing of the ulnar motor nerve conduction velocities around the elbow. (Tr. 296). Plaintiff's median, ulnar, and radial sensory responses were reported to be normal. (Tr. 296). The physician interpreting these studies, John Becker, M.D., concluded they showed "[i]ncidental and very mild left carpal tunnel syndrome" and "[i]ncidental bilateral ulnar entrapment neuropathies at the elbow with no axonal loss". (Tr. 296).

Consultant psychologist Eugene O'Brien, Ph.D., conducted a clinical interview with Plaintiff in March 2008 to assess her mental impairments. (Tr. 299–302). He indicated Plaintiff blamed her psychological symptoms on her spinal problems. (Tr. 299). Dr. O'Brien diagnosed adjustment disorder with mixed emotional features and assigned a GAF score of 65. (Tr. 301). He determined Plaintiff has no or mild impairment in her ability to relate to others, to understand and follow instructions, to maintain attention and perform routine tasks, and to withstand stress and pressure. (Tr. 302). Dr. O'Brien concluded Plaintiff "has sufficient relational abilities, understands and can follow orders as well as maintain adequate attention to perform at least routine non-physical tasks." (Tr. 302).

In April 2008, consultant psychologist Karla Voyten, Ph.D., assessed Plaintiff's mental residual functional capacity (RFC). (Tr. 305–317). She deemed Plaintiff's mental impairments not severe. (Tr. 305). Dr. Voyten concluded Plaintiff has only mild limitation in her ability to maintain concentration, persistence, or pace, and has no other limitations caused by her mental impairments.

6

(Tr. 315). Dr. Voyten said Plaintiff's allegations are partially credible, but "[h]er condition is not severe enough to keep her from working." (Tr. 317).

In May 2008, medical consultant Elizabeth Das, M.D., conducted a physical RFC assessment. (Tr. 319–326). She determined Plaintiff could lift or carry 20 pounds occasionally and ten pounds frequently; could sit, stand, or walk for about six hours in an eight-hour workday; and could push or pull with limitation in her upper extremities. (Tr. 320). Dr. Das said Plaintiff "would be limited to occasional hand controls with [her] right hand", would be limited to frequent handling and fingering with her right hand, and would be limited to frequent overhead reaching with her right arm. (Tr. 321–322). Dr. Das noted Plaintiff's alleged symptoms "are out of proportion to the expected severity" given the medical evidence. (Tr. 324). For instance, Plaintiff "reports that she is unable to sit for any length of time and the evidence d[oes] not support this." (Tr. 324).

In January 2009, Dr. Lakhani examined Plaintiff for a second time and conducted more muscle testing. (Tr. 343–346). This time, Dr. Lakhani reported normal muscle strength in Plaintiff's left shoulder, elbow, wrist, fingers, hip, knee, foot, and toes and her right hip, knee, foot, and toes. (Tr. 343). Plaintiff's right grasp and fine coordination were diminished, but her left grasp, manipulation, pinch, and fine coordination were all normal. (Tr. 343). However, Dr. Lakhani noted muscle spasm in Plaintiff's upper extremities, more so in the right than in the left. (Tr. 344). Plaintiff's active range of motion was slightly diminished in her right shoulder but normal in her left shoulder. (Tr. 344). Both elbows and wrists showed normal active range of motion. (Tr. 345). Plaintiff's left hand and fingers had normal flexion and extension, and her right hand and fingers had slightly diminished flexion and extension. (Tr. 345). Plaintiff's dorsolumbar spine, hips, knees, and ankles also displayed normal ranges of motion. (Tr. 345–346).

Dr. Lakhani remarked from his examination of Plaintiff that she "gets numbness and tingling on the right side from the neck to the shoulder, arm, forearm, and hand. . . . She is learning to eat with the left hand." (Tr. 348). He noted that turning Plaintiff's neck "in certain motions such as looking up" makes the radiating pain and numbness worse, as does moving Plaintiff's right arm in certain ways "like reaching upwards or outwards". (Tr. 348). Dr. Lakhani noted another negative straight leg raising test. (Tr. 349). He determined Plaintiff's fine coordination movements are impaired, stating she "cannot pick up a coin neatly." (Tr. 349). Furthermore, he reported Plaintiff has spasms, mild tenderness, and pain upon flexion of the right shoulder. (Tr. 349).

Dr. Lakhani reported a diagnostic impression of "[c]ervical pain with radiculopathy including numbness and pain mostly affecting the right side", and paresthesia of the right hand. (Tr. 350). In terms of her RFC, Dr. Lakhani determined Plaintiff could "open a jar with difficulty possibly with the left hand but not with the right hand"; could zip, button, and turn a doorknob with the left hand normally but not with the right hand; could not carry any weight with her right hand; and could walk, sit, and stand normally. (Tr. 350).

Medical consultant Michael Stock, M.D. assessed Plaintiff's physical RFC in February 2009. (Tr. 352–359). He determined Plaintiff could lift or carry 20 pounds occasionally and ten pounds frequently; could sit, stand, or walk for about six hours in an eight-hour workday; and could push or pull with limitation in the upper extremities due to paresthesia of the right hand. (Tr. 353, 355). Dr. Stock's RFC assessment was later "affirmed as written" by medical consultant Anton Freihofner, M.D., who noted the absence of left arm difficulty in the medical evidence. (Tr. 391).

<u>Administrative Hearing</u>

Plaintiff appeared with counsel at a hearing before the ALJ on October 24, 2011. (Tr. 30).

Also appearing was William Reed, a vocational expert (VE). (Tr. 30, 55, 106).  Plaintiff testified she has an eighth-grade education and spent some time in cosmetology school though did not graduate from it. (Tr. 35). She said she left school because of her asthma. (Tr. 49). Most of her work experience comes from helping her husband paint houses for his own business. (Tr. 54–55). Plaintiff also worked in the produce section of a grocery store. (Tr. 56).

The ALJ asked Plaintiff if she thought she could work as a mall security guard, where she would have to watch television screens and be on her feet for four hours a day, but not personally intervene beyond calling the police in any situation. (Tr. 37). Plaintiff responded she could not do such a job because a previous telecommunications job where she had to sit in front of a computer and watch the screen caused her pain and numbness all the way down her arms. (Tr. 37). She explained that raising her head from the normal plane of vision causes numbness in her neck and arms. (Tr. 37). Furthermore, Plaintiff testified she cannot lift her left arm behind her back without it dropping to her side immobile. (Tr. 38). When Plaintiff reaches forward, she said she gets a shooting pain from the back of her neck around to the front of her skull. (Tr. 38). She said she experiences this pain "a little bit less" if she takes her medication. (Tr. 38).

Plaintiff testified things regularly slip out of her right hand because of her carpal tunnel and neuropathy from the middle finger to the thumb. (Tr. 39, 49–50). As for her left upper extremity, Plaintiff testified her left hand is "okay" but her left shoulder and left part of her neck get "jagging" and go numb after she makes certain movements like bending over. (Tr. 39). Plaintiff said she is not able to look 90 degrees in either direction. (Tr. 49).

Plaintiff testified she no longer receives pain management because she cannot afford it and the clinic she went to enacted a new policy against prescribing narcotic pain medications.

9

(Tr. 40–41). Plaintiff testified one doctor at that clinic had told her she was addicted to her pain medication. (Tr. 42–43). She testified her medications caused the side effects of cotton mouth, constipation, and memory problems. (Tr. 43). She maintained the personnel at her pain management clinic never advised her to see a neurologist or an orthopedist. (Tr. 42).

When the ALJ asked Plaintiff specifically about her pain, Plaintiff rated her cervical pain a "five to six" on an average day when taking her medication. (Tr. 52). Some days, her neck pain is an eight. (Tr. 52). However, Plaintiff said the carpal tunnel in her right hand "hurts continuous[ly] all day" and "[n]othing makes it feel better." (Tr. 53). Plaintiff further said her doctors have never recommended surgery for her neck or arms, though they did recommend physical therapy but Plaintiff could not afford it. (Tr. 47–48).

Plaintiff testified about her RFC. She said she has done limited driving since 2008 because she "got in a wreck and [] haven't been able to move to turn and see behind me very well." (Tr. 43–44). When pressed for clarification, Plaintiff said she could drive in an emergency, but "on a general day-to-day basis" her husband and daughter drive her. (Tr. 44). In a typical day, Plaintiff testified she does "some dishes" and makes the bed, but cannot cook; Plaintiff's family cooks for her. (Tr. 45). Plaintiff has her husband help her dress because of her arm problems. (Tr. 51). She estimated she could probably lift eight pounds at maximum and said she cannot lift her grandchildren anymore. (Tr. 50). Plaintiff holds a pen with her small finger and ring finger because of her carpal tunnel, and cannot type on a keyboard anymore. (Tr. 53–54).

Plaintiff testified briefly about her mental impairments. She said she gets panic attacks, but does not receive psychiatric care and is "on a mild antidepressant." (Tr. 51). She attributes this to her pain because "[i]t feels like it's never going to end." (Tr. 52). Plaintiff testified she tried to have

10

a second MRI done in 2008 but could not finish it because of her claustrophobia. (Tr. 47).

The VE characterized Plaintiff's prior work at the grocery store as unskilled, medium exertional work. (Tr. 57). The ALJ then posed a hypothetical question, asking the VE to assume an individual of the same education, training, and work experience as Plaintiff, with the following additional restrictions: can perform light exertional work except she can only lift ten pounds occasionally and five pounds frequently; can stand and walk six hours in a typical workday; is limited to simple, routine, repetitive tasks performed in a fast-paced production environment; should avoid exposure to dust, fumes, gases, chemicals, and temperature extremes; and is limited to using her right arm and hand for only 50 percent of the workday. (Tr. 57). Such an individual, the VE testified, would not be able to perform Plaintiff prior work, but could perform work as a photocopying machine operator, security guard, or restaurant hostess – each of which accounts for tens of thousands of positions in the national economy. (Tr. 57–58).

The ALJ then altered his hypothetical, adding the hypothetical individual would have to adjust her whole body and turn in order to look up (as opposed to flexing or extending her cervical spine). (Tr. 58). This additional limitation, the VE said, would not eliminate any of the previously mentioned jobs. (Tr. 58–59). The ALJ then amended the hypothetical again, this time precluding all use of the right arm or hand for all intents and purposes. (Tr. 59). In response to this, the VE eliminated the job of photocopying machine operator, but added the job of usher or other amusement attendant. (Tr. 59).

Plaintiff's attorney asked the VE if adding the restriction of being unable to look side to side without moving her whole body would change his response, and the VE said it would not. (Tr. 61). Plaintiff then asked the VE if being off-task for fifteen percent of the day because of pain would still

allow for work, and the VE said it would not. (Tr. 61). Similarly, the VE said missing two or more days of work per month because of pain would preclude work. (Tr. 62).

<u>The Commissioner's Decision</u>

The ALJ issued an unfavorable decision on January 13, 2011. (Tr. 11–23). He found Plaintiff has the severe impairments of carpal tunnel syndrome, cervical degenerative joint disease, asthma, obesity, and adjustment disorder with mixed emotional features, but determined none of these meet or equal a listing. (Tr. 13–14). The ALJ found Plaintiff has an RFC that allows her to perform jobs that exist in significant numbers in the national economy. (Tr. 16–22). Thus, he concluded Plaintiff is not disabled. (Tr. 23). Plaintiff then sought review of the ALJ's decision. (Tr. 7). The Appeals Council denied review on July 29, 2011 (Tr. 1), making the ALJ's denial the final decision of the Commissioner.

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the Court cannot overturn "so long

12

as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. § 1382(a)(1). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The Court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only

13

if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)–(f), 416.920(b)–(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff challenges the ALJ's decision on two grounds, arguing that (1) the ALJ erred by improperly preventing Plaintiff's attorney from questioning the VE, thereby depriving Plaintiff of a full and fair hearing; and (2) substantial evidence proves Plaintiff's impairments limit her ability to use her left upper extremity beyond the limitations stated in the ALJ's RFC. These arguments are addressed in turn.

<u>Full and Fair Hearing</u>

Plaintiff argues it was reversible error for the ALJ to prevent Plaintiff's attorney from asking certain questions at the hearing because the ALJ allegedly acted in a partisan manner to "shield previous vocational expert testimony" from scrutiny. (Doc. 15, at 8). Plaintiff argues the ALJ relied on the VE testimony he prevented Plaintiff's attorney from cross-examining the VE about. A thorough review of the hearing transcript and the law shows the ALJ followed the regulations and did not commit reversible error at the hearing.

The "ALJ has the ultimate responsibility for ensuring that every claimant receives a full and fair hearing", but "[h]ow much evidence to gather is a subject on which district courts must respect the Secretary's reasoned judgment." *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 189 (6th Cir. 2009) (quoting *Lashley v. Sec'y of* H.H.S., 708 F.2d 1048, 1051 (6th Cir. 1983); *Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir. 1993)). The ALJ has a duty to develop the record because of the non-adversarial nature of Social Security benefits proceedings. *See Heckler v. Campbell*, 461

14

U.S. 458, 470 (1983). The duty to develop the record, however, is balanced with the fact that "[t]he burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (citing 20 C.F.R. §§ 416.912, 416.913(d)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999) (explaining claimant's burden to prove disability).

At the hearing in this case, Plaintiff's attorney attempted to question the VE about the percentage of light work the ALJ's hypothetical RFC would allow for, but the ALJ cut him off. (Tr. 60). Thereupon, the following exchange took place:

> ATTY: Okay. So what I want to know is what percentage of light unskilled work would be available given th[e reduced light] RFC.
>
> ALJ: Well, you know, I don't think this determines [sic] on what percentage. Are there – the question under the regulation is are there jobs in significant numbers in the national economy? So whether that's [sic] my RFC eliminates half of the jobs the DOT classifies as light or one-fourth, that's not relevant.
>
> ATTY: She grids at sedentary, is where I'm thinking, at 50. Not at the alleged onset but at 50. And with a lift 10/5, my question is whether or not that's a sedentary RFC.
>
> ALJ: Well that's a legal question and I'll answer it for you. Under our regulations, if you can do more than sedentary but less than the full range of light, that's where we bring in a vocational expert to tell us how many jobs they have. So legally it's not sedentary. It's more than sedentary but less than the full range of light. And so that puts us within the Social Security ruling that directs us to get vocational expert testimony. So just erase over your mind, you know, whether I said the word "light" or whether I said the word "blank" or whether I said the word "green." What I did say to him was stand or walk six hours, sit for two, lift ten occasionally, three to five frequently, and then my other limitations. . . . So yes, you know, the full range of light is lifting 20 and ten. But what I'm giving is less than a full range of light.

(Tr. 60–61). After this exchange, Plaintiff's attorney moved on to a different line of questioning.

(Tr. 61). Plaintiff asserts this was a stonewalling that constitutes legal error.

This argument requires an explanation of the Medical-Vocational Guidelines, commonly referred to as the grid. The grid is a set of guidelines used by the Commissioner at step five. Where a claimant has only exertional limitations (those limiting his strength), the Commissioner can satisfy his step five burden "without considering direct evidence of the availability of jobs the particular claimant can perform, through reference to the grid". *Abbott v. Sullivan*, 905 F.2d 918, 926 (6th Cir. 1990). Essentially, the grid allows the Commissioner to take "administrative notice . . . of the existence of jobs in the national economy that those with particular combinations of the four statutory factors are capable of performing." *Id.* Through a set of rules, the grid uses combinations of the four statutory factors – age, education, work experience, and exertional RFC, *see* 42 U.S.C. § 1382c(a)(3)(B) – to direct a finding of disabled or not disabled when a claimant has only exertional limitations. 20 C.F.R. Part 404, Subpt. P, App. 2 § 200.00(e).

However, when a claimant suffers from both exertional and non-exertional impairments, or when a claimant is unable to perform substantially all of the exertional demands of work at a given level of exertion, rigid application of the grid is generally inappropriate. *Id*. at 926. Instead, the grid may be employed only as a "framework" to provide guidance, so long as a finding of disabled cannot be made based on the claimant's exertional limitations alone (in which case a finding of disabled is mandated). *Id.*; 20 C.F.R. Part 404, Subpt. P, App. 2 § 200.00(e)(2).

In this case, as Plaintiff's attorney pointed out to the ALJ, Plaintiff would "grid out" as disabled effective at age 50 if her RFC were limited to only sedentary work. *See* 20 C.F.R. Part 404, Subpt. P, App. 2 § 201.00(g); Rule 201.09. However, if, as the ALJ determined, Plaintiff's RFC

allows for greater exertion than sedentary work[2], a finding of disabled is not mandated because under the grid, such an individual with a light RFC is not disabled. *See* 20 C.F.R. Part 404, Subpt. P, App. 2 § 201.00(g); Rule 202.10. Thus, whether Plaintiff's RFC is sedentary or light directly determines whether a finding of disabled is mandated by the grid. Because the ALJ found Plaintiff's RFC to be somewhere in-between these two levels, Plaintiff argues he was required to analyze the erosion of the higher exertional level's occupational base.

The Commissioner has promulgated a ruling on how to use the grid in this situation, as referenced by the ALJ during the hearing:

> If the exertional level falls between two rules which direct opposite conclusions, i.e., "Not disabled" at the higher exertional level and "Disabled" at the lower exertional level, consider as follows:
>
> a. An exertional capacity that is only slightly reduced in terms of the regulatory criteria could indicate a sufficient remaining occupational base to satisfy the minimal requirements for a finding of "Not disabled."
>
> b. On the other hand, if the exertional capacity is significantly reduced in terms of the regulatory definition, it could indicate little more than the occupational base for the lower rule and could justify a finding of "Disabled."
>
> c. In situations where the rules would direct different conclusions, and the individual's exertional limitations are somewhere "in the middle" in terms of the regulatory criteria for exertional ranges of work, more difficult judgments are involved as to the sufficiency of the remaining occupational base to support a conclusion as to disability. Accordingly, [VE] assistance is advisable for these types of cases.

SSR 83-12, 1983 WL 31253, at *2–3. So at the very least, the ALJ must consult a VE in this scenario to ascertain the sufficiency of the occupational base. Plaintiff argues the ALJ failed to

---

2. The ALJ's RFC was more than sedentary because it allowed for six hours a day of standing or walking (Tr. 16), and a job is in the light category "when it requires a good deal of walking or standing" even if the weight lifted is very little. 20 C.F.R. § 404.1567(b).

follow SSR 83-12 by not allowing inquiry into the erosion of light work.

The problem with Plaintiff's argument is that SSR 83-12 directs the ALJ to consider VE testimony about "the sufficiency of the remaining occupational base", not about the percentage of the upper exertional level's work base remaining. That is, even if the only jobs actually available in the economy for a claimant with a light RFC happen to all be sedentary, it does not change the fact the claimant is still capable of performing light work – and the exertional level of work a claimant can still perform at most is what application of the grid depends on, not on whether there are actually jobs available at that higher exertional level.

Plaintiff's argument conflates a claimant's RFC with her occupational base. In *Anderson v. Commissioner of Soc. Sec.*, 406 F. App'x 32 (6th Cir. 2010), the Sixth Circuit said this sort of argument is "premised on a misunderstanding of the regulations". *Id.* at 35–36 ("It is a non sequitur to argue that because plaintiff suffered conditions that limited her job base essentially to sedentary jobs, the ALJ erred in concluding that plaintiff was able to perform a limited range of light work.") (quoting *Johnson v. Barnhart*, 2005 WL 3271953, at *14 (W.D. Wisc. 2005)). It is a claimant's RFC, not her occupational base, used in application of the grid. The grid itself explains its results are based on "analysis of the various vocational factors (i.e., age, education, and work experience) in combination with the individual's *residual functional capacity* (used to determine his or her maximum sustained work capability for sedentary, light, medium, heavy, or very heavy work)". 20 C.F.R. Part 404, Subpt. P, App. 2 § 200.00 (emphasis added).

Because a person capable of light work is generally also capable of sedentary work, *see* 20 C.F.R. § 404.1567(b), the number of jobs available at only the light level is not relevant to the step five inquiry. Thus, just as the ALJ told Plaintiff's counsel (Tr. 60), what matters is whether there are

18

significant numbers of jobs in the national economy Plaintiff could still perform – *see* 20 C.F.R. § 404.1560(c)(1) – not whether there are significant numbers of light jobs in the national economy Plaintiff could still perform. Plaintiff's counsel was trying to ask the VE "what percentage of light unskilled work would be available given" the hypothetical RFC. (Tr. 60). This is legally irrelevant because the jobs actually available in the economy could include only sedentary jobs despite Plaintiff being capable of more than sedentary exertional work, and the grid would still not mandate a finding of disabled because of her higher-than-sedentary RFC.

The ALJ heard VE testimony on the occupational base available to Plaintiff with a modified light RFC. (Tr. 57–59). The ALJ thereby satisfied his obligation under SSR 83-12 to gather VE evidence as to the occupational base for a claimant whose RFC falls between two exertional levels that dictate opposing results under the grid. Given Plaintiff's RFC, the VE's testimony provided tens of thousands of jobs in the economy (Tr. 57–58) – certainly a sufficient number of jobs remaining to support the ALJ's step five determination. Therefore, the ALJ's step five determination of ample work available in the economy is supported by substantial evidence. It was not error for the ALJ to prevent Plaintiff's attorney from questioning the VE on a legally irrelevant topic. *See Hardaway v. Sec'y of Health & Human Servs.*, 823 F.2d 922, 928 (6th Cir. 1987).

RFC Finding

Plaintiff argues substantial evidence shows Plaintiff's left arm is more limited than the ALJ acknowledged in his RFC. The ALJ made no specific reference to Plaintiff's left arm in the RFC finding, and later said "it is clear that the evidence does not support a finding [Plaintiff] has significant limitation in her ability to handle, finger, and feel with the left hand." (Tr. 20). Plaintiff argues "substantial evidence demonstrates [Plaintiff's] cervical degenerative dis[c] disease and

19

carpal tunnel syndrome prevent her from using either extremity on a consistent basis. . . . Evidence demonstrate [Plaintiff's condition] would also prevent her from substantial use of her left upper extremity on a consistent basis." (Doc. 15, at 12–13).

Plaintiff's argument misapplies the Court's standard of review. Even if substantial evidence supports the notion that Plaintiff's left arm is more limited than the ALJ found, that does Plaintiff no good unless the inverse is also true. That is, even if substantial evidence supports a conclusion opposite what the ALJ found, the Court must still affirm so long as substantial evidence also supports the ALJ's position. *See Jones*, 336 F.3d at 477. The Court therefore liberally construes Plaintiff's second argument as advocating the ALJ's RFC is unsupported by substantial evidence in its omission of further limitation on Plaintiff's use of her left upper extremity. On review, though some evidence suggests further limitation of Plaintiff's left arm, the ALJ's findings must be affirmed.

Substantial evidence in the record supports the ALJ's conclusion that Plaintiff's left upper extremity requires no special accommodation beyond the general lifting restriction he imposed. (Tr. 16). For starters, Plaintiff had extensive muscle testing conducted twice by medical consultant Dr. Lakhani. The first time, in March 2008, Plaintiff displayed normal grasp, manipulation, pinch, and fine coordination on the left side. (Tr. 286). Though Plaintiff's right shoulder showed a significantly limited range of motion, Plaintiff's left shoulder showed a normal range of motion. (Tr. 287). Dr. Lakhani determined Plaintiff could open a jar with her left hand. (Tr. 292). The second time, in January 2009, Plaintiff's left extremity muscle strength was entirely normal. (Tr. 343). Her left grasp, manipulation, pinch, and fine coordination were all normal. (Tr. 343). Plaintiff's active range of motion was slightly diminished in her right shoulder but normal in her left shoulder.

20

(Tr. 344). Both elbows and wrists showed normal active range of motion. (Tr. 345). Plaintiff's left hand and fingers displayed normal flexion and extension. (Tr. 345).

At least once in the record, Plaintiff complained of numbness in her left hand. (Tr. 276). This was in June 2006, before the alleged onset date. (Tr. 276). Her physician thought this may have been exacerbated by lifting at work. (Tr. 276). Decreased range of motion in Plaintiff's arms was noted. (Tr. 277). But at doctor's visits throughout the remainder of 2006 and 2007, Plaintiff reportedly had normal pulses and no pedal edema in her extremities. (Tr. 263, 265, 267, 269, 273, 275). In fact, in January 2007, Plaintiff's extremities were also noted to be non-tender with a full range of motion. (Tr. 271). On a multitude of later occasions, Plaintiff's treating physicians reported normal findings with respect to Plaintiff's extremities. (Tr. 379, 381, 384, 388, 416, 418).

The reviewing consultants agreed with the above evidence. Medical consultant Dr. Das determined Plaintiff could push or pull with limitation in her upper extremities. (Tr. 320). She said Plaintiff "would be limited to occasional hand controls with [her] right hand", would be limited to frequent handling and fingering with her right hand, and would be limited to frequent overhead reaching with her right arm. (Tr. 321–322). But Dr. Das did not mention any restrictions for Plaintiff's left arm or hand. Similarly, in consultant Dr. Freihofner's review of the medical evidence, he noted Plaintiff's "allegation of left arm difficulty is not mentioned" in the records. (Tr. 391). Plaintiff even testified that her left hand is "okay" (Tr. 39), and referred to her left hand as her "good hand" in an SSA form she filled out (Tr. 219).

Plaintiff argues the medical imaging confirms a cervical condition that affects both sides of her neck. But most of the medical imaging, just like the muscle testing and nerve conduction studies, indicated a less than disabling severity level of symptoms on Plaintiff's left side. The one MRI in

21

the record – from 2001, before the onset date – revealed moderate degenerative changes with slight nerve impingements. (Tr. 252). After that, all the objective tests resulted in mild findings. One set of x-rays in the transcript showed only mild disc space narrowing, mild proliferative spur formation, and slight spur impingement, resulting in a clinical impression of mild degenerative disc disease. (Tr. 334). Another set of x-rays revealed only mild degenerative changes with a "tiny" spur formation on L5. (Tr. 292). Similarly, nerve conduction studies showed only "incidental and very mild left carpal tunnel syndrome". (Tr. 298). Objective findings of mild severity are not typically indicative of disabling symptoms. *See Blacha v. Sec'y of Health and Human Servs.*, 927 F.2d 228, 230 (6th Cir. 1990); *Sizemore v. Sec'y of Health and Human Servs.*, 865 F.2d 709, 713 (6th Cir. 1988); *Duncan v. Sec'y of Health and Human Servs.*, 801 F.2d 847, 853–854 (6th Cir. 1986). Even if they were, the extensive muscle testing in the transcript, along with treating physician records, nerve conduction studies, and medical consultant opinions, all suggest Plaintiff's use of her left upper extremity is not significantly diminished. In sum, substantial evidence supports the ALJ's conclusion that Plaintiff's left upper extremity requires no special accommodation in her RFC. Therefore, the ALJ's RFC must be affirmed.

## CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds the ALJ's decision denying benefits supported by substantial evidence. Therefore, the Commissioner's decision is affirmed.

IT IS SO ORDERED.

_____s/James R. Knepp, II_____
United States Magistrate Judge